**Marsha MIDGETTE, Plaintiff,**

v.

**WAL–MART STORES, INC., Defendant.**

**No. Civ.A. 01–4277.**

United States District Court, E.D. Pennsylvania.

Jan. 5, 2004.

Louis Aurely, III, Wusintich, Brogan & Stanzione, Downingtown, PA, for Plaintiff.

Patrick J. McDonnell, Mc Donnell & Associates, King of Prussia, PA, for Defendant.

## MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

Plaintiff Marsha Midgette has filed a two-count Complaint, alleging negligence and negligent entrustment, stemming from an unfortunate act of domestic violence against Plaintiff, an employee of Defendant Wal–Mart Stores, Inc. (Wal–Mart), that occurred inside one of Defendant's stores. Defendant now seeks an order granting it summary judgment, pursuant to Fed.R.Civ.P. 56(c), on grounds that there is no genuine issue of fact for trial and thus, it is entitled to judgment as a matter of law. For the reasons discussed below, we grant Defendant's Motion for Summary Judgment.

## I.  FACTUAL BACKGROUND

The relevant facts that lead up to the tragic shooting of Plaintiff all of which appear to be undisputed, transpire over a period of three days, from Thursday, August 26, 1999, through Sunday evening, August 29, 1999. We recount them as set forth by Plaintiff.

By the summer of 1999, Plaintiff, an employee of Defendant Wal–Mart, and her husband, Bryan Midgette (Bryan), had been married for twenty-six years (see Midgette Dep. at 30), with no history of physical domestic violence. According to Plaintiff, "[sic w]hat I can remember, he's never threatened me." (Midgette Dep. at 104.) However, in June 1999, during a time when the couple was not "getting along," Bryan decided to commit himself for mental health treatment of depression. A few days later, against the advice of the doctors that he remain and continue treatment, Bryan checked himself out and returned home to Plaintiff. (Midgette Dep. at 97–104.) Despite continuing to have difficulties, the couple remained together.

The first relevant instance of domestic discord between the couple occurred on Thursday, August 26, 1999. That morning, Plaintiff and Bryan engaged in an argument at their home that led to Bryan pushing Plaintiff forcefully off the barstool upon which she sat, and which caused her to injure her back. He then pulled her up off the ground and raised a fist to her, making her fear that he would hit her. However, instead of hitting her, Bryan released her and offered to call someone to help her. After some resistance, she allowed him to call an ambulance. Plaintiff suffered no injuries from the encounter, receiving only pain medication from the hospital before being released (Midgette Dep. at 113–116.)

Bryan was subsequently charged with assault and told by the District Justice to

stay away from Plaintiff until the preliminary hearing, which was scheduled for the following Tuesday, August 31, 1999. (Incident Report, 8/26/99, Def.'s Br. Ex. D.) The bail conditions requiring that Bryan stay away from Plaintiff did not expressly mention Wal–Mart. Nevertheless, no protection from abuse, or other Court of Common Pleas order was signed that prevented Bryan from seeing his wife. (Midgette Dep. at 72.)

That evening, Plaintiff reported for work at Wal–Mart. She told Terry Moore (Moore), the support manager on Plaintiff's shift, that her back was bothering her because Bryan had pushed her off a barstool that morning. Moore then changed Plaintiff's duties so that she would not endure any heavy lifting. Later that shift, Moore allowed Plaintiff to clock out of work early because Plaintiff continued to experience back pain (Moore Dep. at 13–16.)

After clocking out, Plaintiff went to the car of co-worker, Christine Epright (Epright), to rest her back. Shortly thereafter, her co-worker returned to the car in the parking lot to inform her that Bryan had arrived at the Wal–Mart. According to Plaintiff, Moore told Epright to drive her to a nearby diner. There, Epright called Moore, who told them to return to the store and to enter through the back entrance. By the time they returned, Bryan had left the Wal–Mart. At no time during that night did Plaintiff call the police or think that Bryan would hurt or threaten anyone, including herself. She simply wanted him to stay away from her so that she could do her work uninterrupted (Midgette Dep. at 132–137.) There is also no evidence that Bryan acted disruptively while at the store.

Later that Friday, Plaintiff informed a manager of the store, Randall Mummert (Mummert), of the barstool incident and that she and her husband were experiencing marital difficulties. In response, Mummert told her that he was sorry but that she needed to "keep it out of the store." (Midgette Dep. 138.) According to Plaintiff, Bryan also went into the store and informed Mummert that they were having marital problems. (Midgette Dep. at 153.) Plaintiff also informed Cathy Eroh (Eroh), another support manager, of the barstool incident. Eroh told Plaintiff that she could take some time off work to deal with her family problems. (Midgette Dep. at 146.) She also reminded Plaintiff of the hotline that Wal–Mart made available to all employees, with counselors who would discuss any problem, in confidence. (Eroh Dep. at 10.) Plaintiff never made use of that hotline.

Plaintiff worked her next shift, from Friday night into Saturday morning, without incident. However, during her Saturday night/Sunday morning shift, Bryan made a telephone call to the store. When Plaintiff refused to speak with him, he hung up. (Midgette Dep. at 157.) Later, as she was leaving her shift that Sunday morning, one of her co-workers told Plaintiff that her husband was sitting in his car in the parking lot. Although she was afraid, Plaintiff went to the car alone and spoke with Bryan. He told her that he was there to buy socks. He left and later returned and entered the store, which Plaintiff saw as she was leaving. At no time did Bryan threaten to harm her or anyone else, and never did Plaintiff think she needed to call the police or request assistance. (Midgette Dep. at 149–152.)

Later that Sunday, Plaintiff went to the Philadelphia Zoo with her daughters, their husbands, and their children. When they returned to the home of Plaintiff's daughter, Joy, where Bryan was residing at the time, they found Bryan sitting in the parking lot across from the house. An argument ensued between Bryan and his son-

in-law, during which his other son-in-law called the police. The police spoke with Plaintiff over the phone and informed her that "they couldn't do nothing [sic] about it, not unless physical harm was done." The police did not come out to the house. However, according to Plaintiff, her husband never threatened her during that argument. (Midgette Dep. at 159–166.)

After this incident, Plaintiff stopped by her house to get ready for work, then went to the Wal–Mart with her daughter, Victoria Hall, and Victoria's husband. Although her shift did not start until 10:00 p.m., she arrived at 9:00 p.m. and stood outside to speak with some friends. (Midgette Dep. at 167–68.) She never clocked in. While outside, Plaintiff saw Bryan drive into the parking lot. Her co-worker, Epright, told her to go in the store, which she did. Plaintiff then told her daughter that Bryan had arrived. When Bryan entered the store, Victoria told her mother "to go to the back," to the employee break room, which Plaintiff did after some resistance to the idea. (Midgette Dep. at 169–70.)

Victoria did not approach Bryan to speak to him, but rather went to the opposite end of the store because she "didn't feel like hearing it." According to Victoria, Bryan looked like he was possessed, "a trained robot ... there on a mission and he was going to do it." However, she did not call the police or request assistance from any Wal–Mart personnel. In fact, she and her husband "got caught up on something that [they] had actually been looking for." It was only when they located that item that Victoria sought to find Plaintiff. (Hall Dep. at 91–92.) Clearly, despite having first-hand knowledge of her parents' marital difficulties and witnessing the argument among the family earlier that day, Victoria did not foresee the tragedy that later ensued.

Earlier that evening, unbeknown to Plaintiff, Bryan had purchased standard ammunition for a 22–caliber firearm, commonly used in a 22–caliber hunting rifle, from the sporting goods department at the Wal–Mart. (Emmell Dep. at 9, 11–12.) According to the sales clerk, who had seen Bryan in the store before but who did not know him and did not know anything about Bryan and Plaintiff's marital difficulties, Bryan was calm and polite, and gave her no reason to believe that he was unsound. (Emmell Dep. at 10.)

Around this time, Bryan also approached Richard Faulk (Faulk), the manager of the store, to inquire as to whether his wife was working that night. Faulk informed him that he did not know. At the time, while he knew that Bryan and Plaintiff were having difficulties, he did not know that Bryan had been told to stay away from his wife until his preliminary hearing, nor did he know of any physical abuse that she had suffered. When Plaintiff arrived at the store that evening, Faulk informed her that her husband had inquired about her. (Faulk Dep. at 21–23, 25.)

At around 9:30 p.m., despite not having clocked in and prior to the time her shift was to start, Plaintiff stood in the employee break room. Her husband entered the room and told her he needed to speak with her. Plaintiff told him that he needed to leave, that he would get into trouble for being back there; but, Bryan insisted that he could not leave her. They talked for a little while longer, after which Plaintiff cannot remember what transpired. (Midgette Dep. at 171–173.) According to the police report, at 9:39 p.m., Bryan took out a 22–caliber revolver and shot his wife in the head, then shot himself in the head. Bryan did not survive the shooting, but Plaintiff did. (Pottstown Incident Report, 8/29/99.)

Based on these events, Plaintiff filed a two-count Complaint, alleging negligence

for failing to protect her, as well as negligent entrustment, for selling to Bryan the ammunition that he eventually used to shoot his wife and kill himself. As part of negligence claim, Plaintiff claims that Wal-Mart breached its duty to protect her in the following ways: by failing to call the police when they knew that Bryan was there; having inadequate security; failing to provide her a safe environment to work; failing to have in place a policy to address spousal abuse and to train management on how to handle such abuse; and finally, by selling the bullets that injured her. (Compl.¶ 15.)

Defendant has filed the instant Motion for Summary Judgment, largely on grounds that it owed no duty to Plaintiff to protect her from her husband's criminal behavior. As such, Defendant argues she could not make out a claim of negligence or negligent entrustment against Defendant. We agree. Any duty that Defendant might have owed to Plaintiff was never breached. Moreover, even if we were to find an issue of material fact with respect to duty, no reasonable jury could find that any act or omission by Defendant represented the proximate cause of Plaintiff's injuries. Accordingly, we must grant Defendant's Motion for Summary Judgment.

## II. JURISDICTION

Under 28 U.S.C. § 1332, this Court has original subject matter jurisdiction over claims between citizens of different states in which the monetary amount in dispute is greater than $75,000. Plaintiff resides in Pennsylvania. Defendant Wal-Mart is incorporated in Delaware, with its principal place of business in Arizona. The amount in controversy exceeds $150,000. As there is complete diversity between the parties and the amount in controversy exceeds $75,000, this Court has jurisdiction to hear the instant matter. *See* 28 U.S.C. § 1332; *HB General Corp.*

*v. Manchester Partners, LP*, 95 F.3d 1185, 1197 (3d Cir.1996).

## III. DISCUSSION

Pursuant to Fed.R.Civ.P. 56(c), Defendant moves for summary judgment on grounds that there exists "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." More specifically, Defendant argues that it owed no duty to Plaintiff, assumed or otherwise, either as her employer or as the landowner on whose property the act occurred, with respect to the domestic violence she suffered.

Defendant further argues that its actions were not a substantial factor contributing to the shooting. As such, Defendant argues that Plaintiff could not show at trial either duty or causation, two of the necessary elements required to obtain relief under a negligence theory. Finally, Defendant argues that Plaintiff cannot, as a matter of law, prove negligent entrustment by Defendant.

Rule 56(c) allows for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and is material only if it might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As a court sitting in diversity, we "must apply the substantive law of the state whose laws govern the action," *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir.1990) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82

L.Ed. 1188 (1938)), and accept the decisions of the state's highest court as "the ultimate authority regarding state law." *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 553 n. 3 (3d Cir.1985); *Connecticut Mutual Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983). However, "[i]n cases where the state's highest court has not considered the precise question to be answered, [we are] called upon to predict how the state court would resolve the issue should it be called upon to do so." *Robertson,* 914 F.2d at 378 (citations omitted). In making such a prediction, we shall give "proper regard to relevant rulings of other courts of the [s]tate." *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) (internal quotes omitted); *see also Erie Castings Co. v. Grinding Supply, Inc.,* 736 F.2d 99, 100 (3d Cir.1984); *Wyman,* 718 F.2d at 65.

At the summary judgment stage, the moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thereafter, to defeat summary judgment, the non-movant must respond with specific facts "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. At this stage, our role is "not [ ] to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *Country Floors v. Partnership of Gepner & Ford,* 930 F.2d 1056, 1062 (3d Cir.1991).

We are required to view the record in the light most favorable to the non-moving party, *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402, 404 (3d

Cir.1981), and to resolve all doubts against the moving party. *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). Because we find, after reviewing the record in a light most favorable to Plaintiff, that there is no genuine issue for trial, we grant Defendant Wal–Mart's Motion for Summary Judgment.

## A. Count I: Negligence

In the first count of the Complaint, Plaintiff claims that Defendant breached the duty it owed to protect her from the criminal act of her husband, and that Defendant's negligence was the proximate cause of the injuries she suffered when her husband shot her.

■ To obtain relief through a negligence action, the plaintiff must prove four elements on the part of the defendant:

(1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct;

(2) a failure to conform to the standard required;

(3) a causal connection between the conduct and the resulting injury; and

(4) actual loss or damage resulting to the interests of another.

*Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680, 684 n. 5 (1983); *see also* Prosser, Law of Torts § 30 (4th ed.1971).

As a preliminary matter, we note that this case falls within the personal animus exception of the Workers Compensation Act. 77 Pa. Cons.Stat. § 411. As such, Plaintiff is free to pursue any potential common law remedy available to her.

■ As a general rule under Pennsylvania law, absent a pre-existing duty, a party cannot be held liable for the criminal ac-

tions of a third party unless that party assumed a duty, through some act of its own. *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 746 (1984); Restatement (Second) of Torts, § 315. In other words, unless Wal–Mart voluntarily assumed a duty to protect Plaintiff, or unless Wal–Mart shared with Plaintiff a special relationship that created a pre-existing duty, Wal–Mart cannot be held responsible for the actions of Bryan.

Upon review of the record, we find no evidence that Wal–Mart assumed any duty to protect Plaintiff on the night of the shooting. Moreover, while it is uncertain whether Pennsylvania recognizes a special relationship between an employer and its employee, thus creating a duty to protect her from third parties, we find that even if the Pennsylvania courts did recognize such a relationship, Wal–Mart's actions did not breach that duty.[1]

*Pre–Existing Duty*

As noted by both parties, Section 314A of the Restatement (Second) of Torts identifies the special relationships that give rise to a duty to protect. The parties agree that the main text of the section does not establish a duty between an employer and employee, or any other duty

applicable to this matter.[2] However, Comment a. of this section does state that "[a]n additional relation giving rise to a similar duty is that of an employer to his employee," and directs the reader to Section 314B and to Chapter 14 of the Restatement (Second) of Agency.[3] § 314A, com. a.

We recognize that while Pennsylvania courts have adopted the main text of the section, no court has adopted all its commentary. A review of Pennsylvania cases that have mentioned Section 314A, and particularly those that engage in an analysis of whether a special relationship exists, reveals that no case recognizes or adopts either Comment a. or any special relationship between an employer and employee. *See e.g., Johnson v. Johnson,* 410 Pa.Super. 631, 600 A.2d 965, 972 n. 8 (1991), *superseded by statute on other grounds,* Pa. R. Civ. P. 1035.2, 1035.3 (*see e.g., Harber Philadelphia Center City Office, Ltd. v. LPCI Ltd. Partnership,* 764 A.2d 1100, 1104 (Pa.Super.2000)).

■ Most of these cases list the special relationships that create a duty to protect, but they list *only* those relationships identified in the main text. *See e.g., Brezenski v. World Truck Transfer, Inc.,* 755 A.2d

1. Plaintiff's brief also attempts to create a legal duty to provide employees "a place of employment . . . free from recognized hazards that are causing or are likely to cause death or serious physical harm" to them, as prescribed by the Occupational Safety and Health Act (OSHA). Pl.'s Mem. in Opp. at 14; 29 U.S.C. § 654(a)(1). We need not address this argument because, as Plaintiff concedes, "no specific regulations have been promulgated which would apply to this factual situation. . . ." (Pl.'s Mem. in Opp. at 15.) Further, Defendant correctly points out that Plaintiff's Complaint fails to mention, much less charge, a cause of action under OSHA or § 654. (*See* Def.'s Reply Br. at 7.) Additionally, case law that Plaintiff cites with respect to an employer's duty to "use reasonable care to furnish his employee with a reasonably safe place to work" involves injuries suffered

while employees carried out job responsibilities. *See* Pl.'s Mem. in Opp. at 6; *Finnerty v. Burnham,* 205 Pa. 305, 54 A. 996, 997 (1903). The nature of the duty in these cases falls within the scope of the Workers Compensation Act, which, as stated *supra,* is inapplicable here.

2. The main text of Section 314A recognizes the following four special relationships, out of which exists a duty to protect from a third party: common carriers and their passengers; innkeepers and their guests; landowners and the public to whom they open their land; and custodial relationships. § 314A.

3. Section 512 of the Restatement (Second) of Agency states the exact language as Section 314B of the Restatement (Second) of Torts.

36, 41 n. 4 (Pa.Super.2000); *T.A. v. Allen,* 447 Pa.Super. 302, 669 A.2d 360, 362–63 (1995); *Estate of Mickens v. Stevenson,* 57 Pa. D. & C.4th 287, 294 (Pa.Com.Pl.2002). One lower court case expressly recognizes the exclusion, stating that a duty "arises only" in the relationships identified in the main text. *See Kostas v. Alworth,* 50 Pa. D. & C.3d 455, 457 (Pa.Com.Pl.1988). Based on this oversight of the commentary by *all* of the cases that discuss Section 314A, we believe that Pennsylvania has not adopted the commentary, and thus no such special relationship exists between Wal–Mart and Plaintiff.

Furthermore, even if we were to recognize the commentary, and the duty that would exist between an employer and employee, we would find, as a matter of law, that Wal–Mart did not breach its duty, prescribed by Section 314B.[4] In relevant part, under Section 314B,

> if a servant, *while acting within the scope of his employment, comes into a position of imminent danger of serious harm and this is known to the master or to a person who has duties of management,* the master is subject to liability for a failure by himself or by such person to exercise reasonable care to avert the threatened harm.

§ 314B(1) (emphasis added).[5] We agree with Defendant that, based on the record before us, viewed in favor of Plaintiff, Plaintiff could not establish that anyone in management positions at Wal–Mart *knew* that she was in a "position of imminent danger of serious harm." The record shows that neither Plaintiff nor her children knew, despite their special knowledge of the circumstances. If they were not aware, we fail to see how a reasonable jury could find that Wal–Mart knew Bryan was going to shoot Plaintiff.

For example, Plaintiff makes clear that she never thought that her husband would hurt her or anyone else at the store, and that he had never behaved in a disruptive, much less violent, manner in any public place, including the store. (*See* Midgette Dep. at 136–37.)

Furthermore, Plaintiff's daughter, Victoria Hall, who had just hours earlier witnessed an argument involving her father and mother, and who saw her father when he entered the Wal–Mart that night and thought that he looked possessed, like a robot, continued to shop in the same store. Clearly unaware of her mother's position of imminent harm, she never called the police or sought out Wal–Mart personnel for assistance. (Hall Dep. at 91–92.) If, armed with all her knowledge, Plaintiff's own daughter did not know, it cannot be expected that Wal–Mart would know. As such, the circumstances did not call into question any possible duty under Section 314B.

Plaintiff argues that, based on the knowledge of some management personnel that she was having problems with her husband, his presence in the store, and her attempts to seek help from the manager,

---

4. We make note that, besides the commentary to Section 314A, Pennsylvania likely has not adopted Section 314B, and that Defendant may well be correct that the state intended for the Workers Compensation Act to encompass Section 314B. (*See* Def.'s Reply Br. at 6.) The lone Pennsylvania case that we encountered which mentioned Section 314B did not establish that Pennsylvania has adopted this section. *See Jaindl v. Mohr,* 432 Pa.Super. 220, 637 A.2d 1353, 1356 (1994) (failing to adopt or recognize an adoption of Section 314, instead mentioning Section 314B only because the plaintiff expressly raised an argument under that section, and dismissing it as "misplaced" based on the circumstances.)

5. Subsection (2) is inapplicable here because it is clear that Plaintiff neither became hurt or in any way helpless while carrying out her job responsibilities.

Wal–Mart Management was aware of her position of imminent harm. We disagree. Knowledge of a domestic dispute from three days prior, especially with no other such incident since, does not give rise to knowledge of a position of imminent danger. Furthermore, we believe that Bryan's continued presence in the store, without any scene, incident, or threats of any kind creates a likelihood that his wife was *not* in danger from him.

Finally, while Plaintiff did inform Mummert of her problems and states that she sought protection from him, she also states that the kind of protection she wanted from Wal–Mart merely was for them to listen to her, perhaps empathize with the situation. (Midgette Dep. at 136.) She also admits that she did not request or expect Wal–Mart to ban Bryan from entering the premises. (*See* Midgette Dep. at 74, 76.) More significantly, she did not tell Mummert at any time that she feared for her safety or that she was in a position of imminent harm. Furthermore, she told the manager about her problems with her husband on Friday morning, two days prior to the shooting, at a time at which the danger was not imminent. No reasonable jury could find that the limited conversation somehow conveyed knowledge of imminent harm from a shooting to occur almost three days later, especially when the manager interacted with Bryan less than two hours before the shooting and Bryan behaved normally. (*See* Faulk Dep. at 22.)

We underscore that, based on their actions at the store immediately prior to the shooting, neither Plaintiff nor her daughter were aware of her position of imminent danger. If they were not so aware, no reasonable jury could find that Wal–Mart knew, either, of Plaintiff's precarious position. As such, while we do not believe that Pennsylvania recognizes a special relationship between employers and employees, if such a pre-existing duty existed, Wal–Mart did not breach it.[6] We do not believe that Pennsylvania has made all employers insurers of employee safety from criminal acts of third parties.

*Assumed Duty*

█ Sections 323, 324, and 324A of the Restatement (Second) of Torts, all of which Pennsylvania courts have adopted, describe the legal responsibilities of a party that assumes a duty to another party, and the liability for negligence in undertaking that duty. Plaintiff claims that assistance provided to her on an evening three days prior to the night of the shooting created a duty to protect her from Bryan on the eventual day of the shooting. We disagree.

On the Thursday prior to the shooting, after Plaintiff clocked out of her shift and was resting her back in a car in the Wal–Mart parking lot, Bryan arrived at the Wal–Mart. Plaintiff contends that because the support manager told one of Plaintiff's co-workers to take her away from the store and, after speaking with them at nearby diner, told them to return to the store through an alternative entry because Mr. Midgette was still at the store, Defendant assumed a duty to protect her from her husband. (*See* Pl.'s Br. at 17; Midgette Dep. at 132–33.)

We agree with Defendant's argument that the support manager's actions did not assume a duty to protect Plaintiff, and that the store manager's remarks that Plaintiff keep her private problems out of the store, as callous as they may have appeared to Plaintiff, made clear that Wal–Mart never

---

**6.** While Defendant does not raise this point, we further note that Plaintiff was not working at the time of the shooting and thus likely was not "acting within the scope of h[er] employment" under Section 314B.

volunteered to take on a duty to protect her from her husband. As such, contrary to Plaintiff's sole argument regarding this duty, the findings of Plaintiff's expert that Wal–Mart's policies, and more specifically its handling of Thursday's incident, negligently addresses issues of domestic violence, can play no role here.

The Pennsylvania Superior Court's ruling in *Kerns v. Methodist Hospital,* 393 Pa.Super. 533, 574 A.2d 1068 (1990), is instructive. In *Kerns,* a robbery victim plaintiff claimed that the existence of a hospital's security program created a duty on the part of the hospital to protect him. Additionally, the plaintiff's expert opined that the security program was inadequate, indicating a breach of that duty. Rejecting these arguments, the court found that the existence of the security program created no such duty because the hospital had no notice of the specific kind of violence that the plaintiff had endured at the peril of a third party. *See id.* at 1076.

Similarly, here, Wal–Mart had no notice of the specific kind of violence (a shooting) that Plaintiff would suffer at the hands of her husband. As such, its actions that Thursday to address the situation created no such duty to protect Plaintiff.

█ Furthermore, while we find, as a matter of law, that Wal–Mart assumed no duty to Plaintiff, we note that even if we had found that Thursday's event did create a duty, it was not breached with respect to the shooting. Under Sections 323 and 324A of the Restatement, a party incurs liability only if "his failure to exercise [reasonable care undertaking the duty] increases the risk of [ ] harm, or ... the harm is suffered because of the other's reliance upon the undertaking."[7] Thus, even if we were to assume that Wal–Mart

did assume a duty to protect Plaintiff on that Thursday evening, there is no evidence on the record that would even suggest that Wal–Mart's decision to assist Plaintiff either increased the risk that her husband would shoot her the following Sunday or that Plaintiff was shot on Sunday because she relied on a belief that her employer would protect her from any violence from Bryan. In fact, Plaintiff did not even expect that Bryan would harm her physically at the Wal–Mart, much less shoot her. (*See* Midgette Dep. at 136–37.)

Furthermore, Plaintiff indicates that, while she was uncertain as to exactly what she hoped Wal–Mart might do (she was not even sure if she wanted Wal–Mart to keep Bryan out of the store and was even less certain whether Wal–Mart had the ability to do it (*See* Midgette Dep. at 140)), Plaintiff states that she really just wanted Bryan to stay away so that she could work (Midgette Dep at 137). Thus, any possible duty on which she might have relied from Wal–Mart involved allowing her to do her job, not protecting her from violence she did not anticipate. According to Plaintiff, she wanted Wal–Mart to protect her by "just listen[ing] and understand[ing] me...." (Midgette Dep. at 136). Moreover, Plaintiff was not working at the time of the shooting, making it even less likely that any such duty existed.

Finally, we believe any possible assumption of duty from Thursday's events created liability for Wal–Mart liable *only* on that Thursday evening. If the shooting had occurred that evening, or if Plaintiff had suffered an injury pursuant to Wal–Mart's attempt to protect her that night from her husband, there might be an issue for a jury to decide. However, there is no evidence that Defendant would continue to

---

7. For obvious reasons, Section 324(b) does not apply to these circumstances and thus will

not be discussed.

treat Plaintiff as they did on Thursday evening. It is difficult to see how a duty could extend to three days later, under different circumstances.[8]

*Duty as Landowner*

While she underscores that the crux of her duty argument focuses on the duty to provide a safe workplace, Plaintiff further argues that, as a landowner, Wal-Mart owed a duty to protect her from her husband's actions. Section 344 of the Restatement (Second) of Torts, which Pennsylvania has adopted, states that a landowner, such as Wal-Mart, that opens for business to the public is liable to the public for the intentional torts of third parties if it fails "to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect against it." § 344.

■ However, this duty does not arise until the landowner

> knows or has reason to that the acts of the third person are occurring, or are about to occur [or unless h]e may [ ] know, or have reason to know, from past experience that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor. . . .

*Moran v. Valley Forge Drive–In Theater, Inc.*, 431 Pa. 432, 246 A.2d 875, 878 (1968). For example, in *Moran*, the plaintiff sued a movie theater after suffering injuries due to a firecracker explosion in the defendant's restroom. The Pennsylvania Supreme Court found that the repeated instances of firecracker explosions at the theater, including in a restroom, immediately prior to the plaintiff's injury, combined with the frequency of teenage rowdiness and the unfitness of security to keep

order on the premises, raised an issue for trial as to whether the theater should have foreseen, and thus had a duty to protect or warn with respect to, the incident causing the plaintiff's injury. *Id* at 877–78.

■ Plaintiff has not shown how Defendant had either actual or constructive knowledge of the likelihood of Bryan's conduct, and thus, no duty under Section 344 arose. It is undisputed that Plaintiff's relevant marital concerns commenced just three days prior to the Sunday shooting, with the barstool incident that resulted in criminal assault charges being filed against Bryan. (*See* Police Compl., Def.'s Mot. Ex. D.) Furthermore, despite Bryan's numerous visits to the store (Midgette Dep. at 106), Plaintiff does not identify any time that Bryan behaved in a dangerous, violent, or unbecoming manner on the Wal-Mart premises, nor did he make any threats at that time. (*See* Midgette Dep. p. 142–43.) Thus, it cannot be expected that Wal-Mart would have reason to foresee Mr. Midgette's violent actions.

Contrary to Plaintiff's argument, neither her fear of her husband nor Stuart Forbes' hindsight that had he been present, he would have treated Mr. Midgette like any other "harassment deal" and asked him to leave (Forbes Dep. at 23), raises any issue of material fact as to whether the shooting was foreseeable. (*See* Pl.'s Br. at 19.) There simply is no evidence suggesting a likelihood of violence from which Wal-Mart had a duty to protect the public.

Contrarily, in a case where a woman was stabbed and robbed in a store parking lot, the Pennsylvania Superior Court found that the common occurrence of muggings and purse snatches, which happened as frequently as twice daily, could lead a reasonable jury to conclude the inevitability of

---

8. In fact, one might venture to say that if Wal-Mart did assume a duty that Thursday evening, it fulfilled it satisfactorily because no harm came to Plaintiff that evening.

harm to a patron, and thus that the store had a duty either to warn its customers of such a possibility or to take reasonable measures to prevent it. *See Murphy v. Penn Fruit Co.,* 274 Pa.Super. 427, 418 A.2d 480, 483–84 (1980). Here, the record fails to reveal that Wal–Mart had such notice. Plaintiff presents no evidence of frequent episodes of domestic violence occurring on the store premises by Bryan or anyone else.

## Duty to Call the Police

Finally, as we have addressed all the legal duties that Wal–Mart might have owed to Plaintiff, and have found that Wal–Mart breached no duty, we do not find it necessary to discuss the extensive analysis set forth by Defendant with respect to whether it had a right to ban Mr. Midgette from the premises or to call the police when he arrived there that Sunday night. (See Def.'s Mem. at 28–31.) The duty analyses, *infra,* show that, regardless of whether Wal–Mart had such a right, it owed no legal duty to Plaintiff either to ban her husband from the store or to call the police. We further note that Plaintiff presents no case law or rule establishing such a duty. Speculation on the part of individuals as to how they would have reacted had they been present the night of the shooting does not give rise to a legal duty. (*See* Pl.'s Mem. in Opp. at 21.)

## Legal Cause

■ Having found that Wal–Mart did not breach any duty it might have owed to Plaintiff, our analysis can cease because Plaintiff could not show the four elements necessary to win a negligence claim (duty, breach, causation, and injury). However, for the sake of thoroughness, we believe that, even if we were to have found that Wal–Mart breached some duty, as defined by Plaintiff, no reasonable jury could find that Wal–Mart's acts or omissions represented the legal cause of Plaintiff's tragic injuries.

Plaintiff has alleged that Defendant breached the following duties: to call the police when her husband arrived at the store; to have adequate security and a safe environment to work; and to implement an employee spousal abuse policy that advised management on how to address domestic abuse. Plaintiff has further alleged that Defendant breached a duty when it sold ammunition to her husband. (Compl.¶ 15.) We find that, even if Defendant had carried out all of the above practices, thus satisfying the duties that Plaintiff believes Defendant owed, Bryan very likely still would have succeeded at shooting his wife. As such, no reasonable jury could find that, but for the actions and/or omissions of Wal–Mart, Bryan would not have shot his wife that night.

■ To satisfy the prima facie element of causation, the plaintiff must "establish a causal connection between [the] defendant's conduct and the plaintiff's injury." Furthermore, we cannot find the defendant's breach of duty to be a proximate cause if "the plaintiff's injury would have been sustained even in the absence of the defendant's negligence." *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280, 1284 (1978).

■ As a matter of law, we are required to make the threshold determination of whether Defendant's conduct, or alleged breach of duty, could constitute the proximate, or legal, cause of Plaintiff's injury. *Brown v. Philadelphia College of Osteopathic Medicine,* 760 A.2d 863, 868 (Pa.Super.2000). In other words, we must determine whether Wal–Mart's alleged conduct or omission " 'was a substantial factor in producing the injury.' " *Id.* at 869 (quoting *Vattimo v. Lower Bucks Hosp., Inc.,* 502 Pa. 241, 465 A.2d 1231, 1233 (1983)) (plurality opinion) (internal quotes omitted). According to the Restatement,

The following considerations are in themselves or in combination with one another important in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

(a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;

(b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; [and]

(c) lapse of time.

§ 433 of Restatement (Second) of Torts; *Brown,* 760 A.2d at 869; *Vattimo,* A.2d at 1233–34.

With respect to subsection (a), the other factors that contributed to the unfortunate harm suffered by Plaintiff far outweigh any act or omission on Defendant's part. For example, clearly the actions of Bryan produced the most substantial and detrimental harm to Plaintiff. His obtaining a firearm, pursuing his wife, and carrying through with his intent to shoot her clearly played the largest role in the shooting. Bryan's mental health concerns likely also played a significant role in the events of that Sunday evening. (*See* Midgette Dep. at 96–104.)

Additionally, the events during the preceding few days that led up to the shooting, none of which involved Wal–Mart, such as the barstool incident and the encounter Saturday evening following the trip to the zoo, which likely spurred the actions of Bryan, contributed to the shooting. Thus, as to the first factor, Plaintiff could not show that any action or omission by Wal–Mart was a substantial factor contributing to Plaintiff's injuries.

Similarly, Plaintiff does not even allege that Defendant "created a force or series of forces which [we]re in continuous and active operation up to the time of the harm ...." § 433(b). A failure to call the police, implement a spousal abuse policy, train management regarding domestic abuse, or refrain from selling ammunition from a party not otherwise restricted from purchasing ammunition does not create such a power.

Finally, while the shooting occurred shortly after Wal–Mart's alleged breach of duty (i.e., sale of the ammunition and failure to protect Plaintiff), this factor does not outweigh the absence of the other two factors. As such, we find that Wal–Mart's actions or omissions did not constitute a substantial factor to the injury suffered by Plaintiff. Thus, no reasonable jury could find that Wal–Mart's alleged breach of duty was the proximate cause of Plaintiff's injuries.

While not directly on point, we find the Pennsylvania Superior Court's ruling in *Hill v. Acme Markets, Inc.,* 350 Pa.Super. 219, 504 A.2d 324 (1986), to be instructive. There, the estate of a woman who died from injuries suffered during a car accident with the defendant's employee claimed that the defendant grocery store was negligent, in part, because it failed to monitor its employee's activities, despite knowing his mental health history,[9] and because it failed to establish policy and train management to address mental and emotional disorders in its employees. *See id.* at 324–25.

Sustaining the defendant's demurrer, which carried a higher threshold for the

---

**9.** The employee had endured an "acute paranoid breakdown or a toxic drug psychosis."

*Id.* at 324, 504 A.2d 324.

defendant to satisfy than the defendant's burden here, the court reasoned that

> [t]o suggest that an employer must [ ] monitor his employees as to be held responsible for failing to contemplate that a given employee would become emotionally upset, leave the premises, [and negligently cause a car accident] would, in effect make the employer the insurer of its employees' conduct. . . . It is not enough that appellant argue the linkage of but-for causality, for the law requires more.

*Id.* at 325. Accordingly, "[t]o hold otherwise would . . . fix an impossible burden on an employer to constantly monitor each employee's mental state and assume a risk of non-detection which would unfairly fix upon him responsibility for employee's negligence totally unrelated to his employment." *Id.* at 326. Plaintiff requests here that we extend this "impossible burden" beyond Defendant's employees to its employee's families, which we simply cannot do.[10] We will not make Defendant an insurer.

We further agree with Defendant's reasoning that Wal–Mart could not have prevented the shooting. As demonstrated by the inability of the police to act when Plaintiff's family called the night before the shooting to seek assistance (*see* Midgette Dep. at 163), if the police, whose very function it is to protect the public and anticipate potential criminal activity, could not have acted with respect to Bryan, certainly Wal–Mart could not be expected to have known or anticipated the unfortunate actions of Bryan.

Furthermore, because Bryan was not acting disruptively (*see* Emmell Dep. at 10; Faulk Dep. at 22) (making small talk with Bryan), and in fact, had never acted inappropriately in the store or made threats (*see e.g.*, Midgette Dep. at 136–37), had Wal–Mart called the local police, as Plaintiff believes it should have, it likely would have received the same response that her family had received the night before: that the police could not do anything because no one had suffered any physical harm. (*See* Midgette Dep. at 162–63.)

Similarly, the existence of a spousal abuse policy, designed to assist Management to handle issues of domestic discord among its employees, likely would not have prevented the shooting, and certainly could not be characterized as a substantial factor contributing to Plaintiff's injury. Even Plaintiff's own expert cannot conclude that such a policy would have prevented the shooting. (*See* Brill letter, Def.'s Mot. Ex. T at 2 (". . . there is every reason to believe that the shooting *could* have been prevented.") (emphasis added))[11]

Finally, if Wal–Mart had not sold the ammunition to Bryan, perhaps the shoot-

---

**10.** While we recognize the distinction between the cases, in that the employee's negligence in *Hill* occurred off of the defendant's premises, we note the undisputed fact that at the time of the shooting, Plaintiff was not working. (*See* Midgette Dep. at 167–68.) We find the location of the shooting to be mere happenstance, as the place where Plaintiff just happened to be at the time.

**11.** We find Mr. Brill's letter of findings to be a bit confusing. He finds that the lack of security constituted a substantial factor to the shooting; however, his reasoning excludes any discussion of security. Furthermore, we agree with Defendant that the close relationship and involvement of Plaintiff's family minimizes the value of informing Plaintiff of resources in the community and particularly of the option of a women's shelter, which Mr. Brill believes would have prevented the shooting. Finally, Mr. Brill's belief that Wal–Mart should have banned Bryan from the premises (*see* Brill letter at 3), despite any disruptive behavior in the store or order prohibiting his presence, and especially absent any such request from Plaintiff, raises serious policy and liability concerns for Wal–Mart, as a business owner, that need not presently be addressed.

ing might not have occurred exactly when it did. However, the argument still fails under a proximate cause analysis because it certainly could not be concluded that had Wal–Mart not sold him ammunition, Bryan would not have shot his wife later that night with bullets he easily could have purchased elsewhere. He also could have used a knife.

The record indicates clearly that this tragedy simply could not have been prevented because no one but Bryan could have anticipated his senseless acts that Sunday night. Plaintiff's children, who were present in the store and who did not themselves call the police or ask Management to intervene, did not anticipate it. (*See* Victoria Hall Dep. at 92–93 (hearing the screams but thinking that she would just separate her parents and talk to him); Midgette Dep. at 170, 174–75.) Not even Plaintiff herself, who knew Bryan best, foresaw the event that would transpire when she remained talking with her husband in the break room without seeking help or leaving. (*See* Midgette Dep. at 172.) In fact, she seemed more worried about the fact that Bryan was in the break room, where only employees were allowed. (*See* Midgette Dep. at 171 ("you're not even supposed to be back here [sic] you'll be in trouble."))

If the people closest to the situation could not have anticipated it, we cannot expect that Wal–Mart could foresee Bryan's actions, or that its failure to call the police, maintain the kind of spousal abuse policy that Plaintiff believes it should have, or prohibit the sale of commonly-used and sold ammunition to someone with no restrictions on his ability to purchase firearms or ammunition, would have prevented the shooting. Certainly, no reasonable jury could find that the shooting "would have been foreseen by an ordinary person as the natural and proba-

ble outcome" of Defendant's failure to carry out the above tasks. *Reilly v. Tiergarten Inc.*, 430 Pa.Super. 10, 633 A.2d 208, 210 (1993) (citing *Merritt v. City of Chester*, 344 Pa.Super. 505, 496 A.2d 1220, 1221 (1985)).

It further could not be found that any of Wal–Mart's acts or omissions " 'produce[d the plaintiff's] injury, and without which the [shooting] would not have occurred.' " *Wisniewski v. Great Atlantic and Pacific Tea Co.*, 226 Pa.Super. 574, 323 A.2d 744, 748 (1974) (quoting *Coyne v. Pittsburgh Rys.*, 393 Pa. 326, 141 A.2d 830, 835 (1958)). As such, Plaintiff could not make out the causation element of her negligence claim and summary judgment for Defendant is warranted on those grounds.

**B. Count II: Negligent Entrustment**

█ Count II of Plaintiff's Complaint alleges that by selling to Bryan the ammunition that he ultimately used to shoot his wife, Wal–Mart is liable to Plaintiff on grounds of negligent entrustment. (See Compl. ¶¶ 20–23.) Under Section 308 of the Restatement (Second) of Torts, which Pennsylvania has adopted to define negligent entrustment,

> [i]t is negligence to permit a third person to use a thing or to engage in an activity which is under control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

Restatement (Second) of Torts § 308 (1965); *Ferry v. Fisher*, 709 A.2d 399, 403 (Pa.Super.1998). Based on the record before us, we find that no reasonable jury could conclude that Wal–Mart knew, or should have known, that Bryan either intended or was likely to use the ammunition Wal–Mart sold to him to risk harm to anyone. As such, we must grant the Mo-

tion for Summary Judgment with respect to Count II.

Plaintiff has set forth no evidence that Wal–Mart had reason to know the state of Bryan's mind the night of August 29, 1999. Plaintiff admits that despite the numerous times her husband had been at the store, including during the few days preceding the tragic events during which their domestic dispute had escalated, Bryan never behaved disruptively, violently, or in any way threatened anyone at the Wal–Mart. (*See* Midgette Dep. at 109–110 (identifying a non-violent argument about a vehicle as the only possible scene Bryan may have displayed at Wal–Mart.))

Moreover, the clerk who sold the ammunition indicated that Bryan Midgette was very calm and courteous during the purchase, which were bullets for a twenty-two caliber firearm, a common hunting ammunition and a common purchase at Wal–Mart. (Emmell Dep. at 10–12.) Nothing about the encounter would give rise to suspicion of Bryan's future intentions. While it is pure speculation, considering Mr. Midgette's mental health history, it is possible that at the time he purchased the ammunition, he did intend to use it for a lawful purpose, then decided during the time that ensued prior to the shooting to use it attempt a homicide-suicide. In such a scenario, it would be impossible for Wal–Mart to have reason to believe that at the time he purchased the bullets, Bryan intended to commit a crime.

Regardless of the scenario, considering the absence of any kind of violence or disturbing behavior by Bryan at any time on the Wal–Mart premises, and certainly considering the absence of any violence against Plaintiff since the barstool incident, despite the number of encounters between the two parties, no jury could reasonably find that Wal–Mart knew or had reason to know that Bryan either intended or was likely to use the ammunition to create an unreasonable risk of harm to anyone.

Furthermore, Bryan, a hunter, owned and used several firearms, and had never been in trouble regarding his use of a firearm. (*See* Midgette Dep. at 50–51, 71–72, 126.) There is no evidence to lead a jury to find that Wal–Mart would anticipate, or have reason to anticipate, that Mr. Midgette would abuse a firearm. Plaintiff, who knew him better than anyone, did not think he would hurt anyone (Midgette Dep. at 136), nor did she have reason to believe he ever would abuse a firearm. (*See* Midgette Dep. at 50–52.)

Finally, we are not persuaded by Plaintiff's use of *Brown v. Wal–Mart Stores, Inc.*, 976 F.Supp. 729 (W.D.Tenn.1997), a case involving Wal–Mart's sale of ammunition to an individual under twenty-one years of age, despite federal statutory restrictions on some of such sales, to attempt to show Defendant's negligence. *Brown* is not binding on this Court, and is clearly distinguishable.

First, the case involves Tennessee tort law, making it wholly inapplicable. Furthermore, the court there denied summary judgment not based on substantive grounds, but rather on procedural grounds. Wal–Mart's motion for summary judgment basically ignored the negligent entrustment claim, addressing it only by stating conclusorily that the plaintiff had failed to state a legally recognizable claim under Tennessee law. Consequently, "[b]y failing to affirmatively attack Plaintiff's case, Defendant [ ] failed to meet its initial burden under Rule 56(c)." 976 F.Supp. at 735. We further note that the clerk who sold the ammunition in this case knew she could not sell to people under twenty-one years of age and was certain that indeed Bryan met that criterion. (*See* Emmell Dep. at 8–9.)

While we do not find Defendant's comparison to *Neyman v. Soutter,* 205 Pa.Su-

per. 8, 205 A.2d 685 (1964), entirely persuasive, we do find it persuasive that the negligent entrustment cases involving shootings tend to focus on minors' use of firearms and the possible negligence of the adults who owned or controlled those firearms. *See* 205 A.2d at 687 (discussing cases of negligent entrustment involving weapons). Underage use of firearms is a clear case for a jury to determine possible negligent entrustment; the circumstances at issue here are not such a case.

We do find one such firearms case to be informative. In *Johnson v. Johnson,* 410 Pa.Super. 631, 600 A.2d 965 (1991) (overruled on other grounds), the court affirmed the grant of summary judgment against a woman who claimed that the men accompanying the thirteen-year-old boy who accidentally shot her son during a hunting trip were negligent for entrusting the shooter with the firearm. Under Section 308 of the Restatement, to state a prima facie case for negligent entrustment, *inter alia,* the plaintiff must show both that the third party could possess the harmful item, or engage in the harmful action only with the consent of the defendant, and that the defendant had reason to think that if it withheld consent, the third party would no longer be able to possess the item or participate in the activity. § 308, com. a.; *Johnson,* 600 A.2d at 970–71.

Despite presenting testimony from one of the hunters that he contemplated taking the gun away from the teen because the boy was acting erratically, the court found that the plaintiff did not make out a prima facie case because she could not show that the particular hunter ever had control of the boy or the firearm. 600 A.2d at 971. The only such person who could control the boy and his possession of the gun was his father and thus, only his father could be found negligent. *Id.*

Unlike in *Johnson,* where the court at least found that the testimony showed that the defendant had reason to believe that he might have been able to prevent the shooting, here, Plaintiff cannot show that if it did not sell ammunition to Bryan that it would have reason to believe it could have prevented him from having it. It is undisputed that Bryan was under no kind of restriction preventing him from using a firearm or ammunition. Further, Wal-Mart clearly is not the only place where one can purchase ammunition, especially for a firearm as common as a twenty-two caliber gun.

Thus, even if Wal-Mart had refused to sell to Bryan (i.e., withdrew consent), based on the events of the preceding few days, it still would have no reason to believe, and based on the availability of ammunition elsewhere, *could not* have believed, that it could have prevented the shooting. Wal-Mart simply had no control over Bryan and thus could not have prevented the shooting from occurring. As such, Plaintiff's negligent entrustment claim must fail and, as to Count II, we grant summary judgment to Defendant.

## IV. CONCLUSION

Plaintiff's two-count Complaint alleges both that Defendant was negligent in its failure to protect its employee, and that it is liable on grounds of negligent entrustment for selling to Bryan Midgette the ammunition he eventually used to shoot Plaintiff and himself. We find that Wal-Mart did not breach any duty that it may have owed to Plaintiff, and that any breach of duty perceived by Plaintiff could not constitute a legal cause of Plaintiff's unfortunate injuries. As such, because we find that, as a matter of law, Plaintiff could not make out a prima facie case of negligence, we grant Defendant's Motion for Summary Judgment with respect to Count I.

We further grant Defendant's Motion with respect to Count II because we find that no reasonable jury could conclude that Wal–Mart had notice of any kind. As such, Plaintiff could not establish a prima facie case of negligent entrustment. Thus, there are no issues of material fact for a jury to address. This case is dismissed.

## ORDER

AND NOW, this 5th day of January, 2004, after full consideration of Defendant's Motion for Summary Judgment, filed October 14, 2003, the Plaintiff's response thereto, filed November 13, 2003, Defendant's reply, filed November 26, 2003, and Plaintiff's surreply, filed December 8, 2003, it is hereby ORDERED that said motion is GRANTED, and judgment is entered in favor of Defendant on all claims. This case is closed.

## ORDER

AND NOW, this 5th day of January, 2004, judgment is entered in favor of Defendant on all claims and against Plaintiff.